The next case on our calendar is Mark Burns v. Daniel F. Marticello Good morning, Your Honors. May it please the Court. Noam Beale for Appellant Mark Burns. This Court posed the question, whether there is a constitutional right to refuse to become a prison informant. The answer to that question is an emphatic yes. And I would like to spend the bulk of my time discussing it. Where does that constitutional right come from? It derives from the First Amendment's right not to be compelled to speak, from the Eighth Amendment, and from the Fourteenth Amendment, the substantive due process. Does that mean that if there's a fight in the prison and one person is injured, leave this case alone, leave these facts alone, and they confront, and they ask one person who's been party to that fight and who's injured, what, you know, how did this go about, and who did this to you? He has the right to refuse to tell them. I think in a case like that, and I'll address why this is not that case, in a case like that where the officers are investigating, are doing a particularized investigation of a specific safety issue in the prison or a specific crime that was committed, they may have the ability to seek to compel that kind of statement from a prisoner. So here it seems to me there are really three different kinds of questions that could be asked of a person. One is to ask them to say something that is, or do something that is actually false. It's the case that Judge Kears was on, the name is escaping me now. Jackler. Jackler. And there's that. And then there's the question of, you know, who did this to you, which is closer to this case but also consistent with the hypothetical I just asked. And then there's another question that could be asked. I want you to be my pet snitch in perpetuity. You've got another five years here and I want you to report everything that you see that's going on here. And if you don't, there are going to be consequences. I see those all being different kinds of statements, or different kinds of requests for information. And I have a problem with the latter one, whether the prison authorities could do that. And I also have, obviously, a question of whether the prison authorities could require a prisoner to issue a false affidavit, the Jackler. I mean, that's not just a problem, it's precedent in our circuit. But what I do question is the narrow one that we're talking about here. I know there's the broader one, too, because there are allegations that he asked him to be his personal snitch on an ongoing basis. That's right, Judge. So I think there's a because the plaintiff in this case testified that they asked him questions that make this case the third kind of case. They asked him general questions about drugs and gang activity in the prison and told him, you know, we want you to give that information because you've been here a long time. They're denying this. That's right. And what they are operating on is the fact that they got a call from his wife that he had been injured, and then they confronted him, and he was injured in a fight. And then they talked to him, and they found a bruised eye, a black eye. And then they wanted to put him in protective custody for that reason, because this could have been an ongoing problem. That's right. And defendant's entire argument on appeal rests on that set of facts. But those are the facts that defendants hope to prove to a jury at trial. Those facts are disputed. So I'd like to just talk briefly. So we're talking about the second. This is the second example you raised, but on the facts of this case. Is it implausible? It seemed to me that it was quite plausible that the facts were as they as they described. Nobody's disputing the fact that the wife called. Nobody's disputing the black eye. He's got this statement that, well, in the commissary, a tin or a can of some kind fell on him and gave him a black eye. But he didn't report it right away. He reported it the next day. So a couple of points on that. First of all, his testimony that he was injured by a can falling him in the commissary was corroborated by Officer Jablanski, who testified at the hearing that Mr. Burns reported the injury to him right away. He didn't fill out a medical form. Oh, I'm sorry. You report it right away? You mean verbally? During his shift. Correct. He reported it right away. And then, according to Burns, he was told that he could waive going to the infirmary. The next day, his eye swells up and he goes to the infirmary. And the report, the written report that's in the record, is from the next day because that's the day he actually went to seek medical treatment. But his statement that he reported right away... You're hit by a can sufficient to give you a black eye and cause swelling. Do you normally wait a day to have that happen? Well, I think in this case, he reported to Officer Jablanski. And this is what Officer Jablanski testified to. I was hit by a can. You know, I'm all right to continue work. I'll waive going to the infirmary today. Then, you know, this is not in the record, but presumably his eye swells up that night. He wakes up in the morning. It's not looking so good. And then he says, okay, I better go seek medical care. And Officer Jablanski corroborated that. There was no evidence that Captain Shanley, the officer who asked him to become his personal informant, went and spoke to Officer Jablanski to confirm that. And I think Mr. Burns' account is also corroborated by the testimony of Officer Noah. This is the officer who wrote up the involuntary protective custody report, who said he had received word that the inmate's wife had called and reported that he had been cut. And he did a visual inspection of his body and said no cuts were visible. And he's asked in the... more that there had been a fight. So the specific testimony that Officer Noah gave is that she called and reported that he had been cut. Now, Officer... Captain Shanley said, I received a call from her that there was a safety concern about this inmate. But he did not testify that he did anything to explore what that safety would have that information. He didn't do any further investigation. And I think even if such a call came in... I mean, it's implausible that she would have just called out of the blue to say this if there hadn't been some communication of some kind. I mean... So I should say that it is that she didn't make the call. I thought that the plaintiff here said that she'd called because she was a troublemaker. So when he's initially confronted and they say your wife called, he says, well, if she did, that's because we're having problems and she doesn't know what she's talking about. Then in his deposition, he is asked by counsel for defendants, did you later learn whether or not she had in fact called? And he said, yes, she didn't call and she's prepared to testify to that. So there is a dispute about whether in fact she called. But even if she did, I think it's a disputed issue of fact, whether any such fight occurred. Mr. Burns' testimony that he was injured by the can falling on him is corroborated by other evidence. It's not just his say-so. And the officer's statement that that's the reason he was put in involuntary protective custody is undermined by their subsequent statements that they wanted him to become their personal informant going forward. Let's... Leaving aside the sort of good faith or bad faith of putting him in protective custody, if he was legitimately put into protective custody, uh, he was there for a long time. That's right. He was there for... That's the question I'm going to be asking your adversary and I'm giving him a heads up now. Uh, why, uh, what was done to review that situation, if anything, um, what justifies keeping him in for, for that, that period of time? There's, there's nothing in the record to show that they did any kind of review. I know in, in Bureau of Prisons facilities, they do a, a shoe review every 30 days. There's no that happened. To the contrary, plaintiff testified that, uh, repeatedly throughout his time in segregated custody, defendants came in and said, if you'll give us information now about drugs, we'll let you out. That totally undermines that he was in there for any safety reason, because if there was a safety reason, they shouldn't have let him out. But instead, they were seeking to have him conscripted as their informant going forward. And if he, if he would agree to it, they would have let him out of segregation, but he refused. And that refusal was protected by the first... There's no, uh, uh, official syst, systemic, uh, program for people who are in protective custody who don't want to be in protective custody to be heard. In other words, there's no, there's no, like in the shoe, it's every 30 days or whatever, but for protective custody, that's not true? That I, I don't know. That's not in the record and defendants have not raised that, uh, as, as part of a defense to, um, to plaintiff's allegation that they were keeping him in simply because of his persistent refusal. The, the, uh, the, the prison conditions that exist in, um, protective custody, um, as your client portrays them are not, are not terrific. Um, what about, um, how does that differ from or is it, is it, is he actually put in the shoe, but they don't call it a shoe because it's protective custody? So what he alleges, what he alleges, uh, first of all, is that he's held in the same unit as inmates who are being held for disciplinary charges. So effectively it is the same space. Uh, I think it's, it's keep lock, it's keep lock, which has a, a regulatory distinction from the shoe, but this court has held in, in a case that we cited in our brief that keep lock conditions are equivalent to the shoe. So I, I'm not sure it's, it's specifically the special housing unit in the sense that that's a location, but it's the same conditions as the special housing. You say the term keep lock, is it keep lock? Is that what you're saying? Keep lock, keep lock, correct. Uh, K E E P L O C K. Keep lock, okay. Correct. And, and plaintiff alleges that, uh, although, uh, he was supposed to be given certain privileges as a protective custody inmate, um, as opposed to a keep lock or a disciplinary inmate, he was in fact not given those privileges and he was kept in keep lock status just as if he had committed an infraction. And that is why we allege, and it's at the very least, the disputed issue of fact, whether, uh, their decision to put him in involuntary protective custody and keep him there was punishment, was retaliatory punishment for his exercise of a constitutional right. And I, I, I see my time has expired. I haven't gotten to the constitutional. It has expired, but you have two minutes for rebuttal. Thank you. We'll hear from the government. Good morning. May it please the court. Uh, I know that defendants are entitled to qualified immunity in this case in any event, but it's not necessary in this case involving only a retaliation claim to decide whether there's any constitutional right for an inmate to not be in an informant because under the undisputed facts here, there were independent non-retaliatory reasons for putting plaintiff in protective custody. Plaintiff's wife called the prison expressed. Why aren't these disputed issues of fact? I mean, you know, based upon, I accept your side of it. Uh, that I know what you, I know what these facts are. I think all of us do. We've read the papers, but the question is that, um, the prisoner is saying that this was, this isn't what happened. Uh, and, uh, that, uh, there's, uh, that, uh, whether she called or not as an issue of dispute, there are a whole lot of issues that are raised here, uh, about, about the circumstances. Well, two completely different stories about what, why, why he ended up in where he ended up. We, your honor, we need competent evidence to create an issue of fact on a motion for summary judgment. Uh, plaintiff did say in his deposition that, uh, his wife didn't call, but in the, the very statement submitted with his complaint, he says that his wife's call was just her way of causing trouble. Um, if his wife called your adversary said I'd have to go back and read the record if it was conditional or not. I, I don't recall that it was conditional, your honor. Uh, and I don't think plaintiff can create an issue of fact by contradicting himself like this. Also, uh, yeah, but, uh, on summary judgment, it's a, it's a question of whether there are issues. Uh, what about the, uh, the, um, fact that he reported right away verbally to the officer that he had been hit by the can? The more answer that I would just like to add that plaintiff has no personal knowledge of whether his wife calls. He was in prison. I'm not talking about the wife now. I'm talking about getting hit. Yes. Yes, your honor. I wanted to, to make that further point. Um, the commissary officer does not, uh, testify at the hearing, uh, that he reported that right away. It's, uh, uh, Pelley supplemental appendix page 67. Uh, uh, do you recall a point in time where Mr. Burns had reported an injury? Jablonski. Yes, I do. Uh, hearing officer, do you recall when that was Jablonski? Not off the top of my head. Uh, do you recall what was reported? Uh, yes. Uh, Burns, a can hit him in the, in the eye from the top of the shelf. I logged it in the book. He never, he never testifies that he reported it right away. And in fact, plaintiff admit. So that, um, there's, I, I had understood from your adversary that there were two, two actions taken by Jablonski. One was to hear the verbal report on the day it occurred. And then the second, the next day to do the report. Essentially what you're saying is it all happened at the same time. I think that's correct. That's what I came on the bench. That's what I understood the situation to be. I think that's correct, your Honor. And plaintiff admits at the hearing that he didn't report the injury until the next day, but there's also no dispute. I don't think there's a material issue of fact on whether the wife called because she did not submit an affidavit, uh, indicating that she did not call. Um, there's no dispute about, uh, that he has this black eye, uh, injuries that are certainly consistent with his wife's call. Um, consistent with a stabbing, which is what, um, the, uh, prison officers said he was said happened to him. Uh, in, in, in the testimony, there's indication about a cut, but in the, uh, in, in the documentation, the involuntary protective custody documentation, um, the, the, there's the indication of the black eye, of course. And there's also a finding of a two and a half inch cut on the back of his neck, which I also think plaintiff is not disputing. But I'd also like to add that. So you have the you have, uh, the fact that he did not immediately report the injuries, but we also have an, an evidentiary hearing here in front of an independent hearing officer who I would note that plaintiff has not sued for retaliation, um, who reasonably decides after due process, uh, that he should, that he should be in protective custody. So I think under these facts, there's no genuine issue that plaintiff would have and should have been placed in protective custody, even absent any retaliatory motive here, accepting those arguments. Why, why the, how, what can justify him being in for the length of time that he was in seven months? Well, your honor, uh, first of all, under docs directive 49, 48, uh, protectives cut custody status is reviewed every 30 days. Uh, that's indicated at, uh, uh, supplemental appendix or appellee supplemental appendix, page 87. Is there any evidence here that this, this, this, uh, regulation was followed? Uh, I don't believe we have in this, in this record, uh, the, the documentation that would result from that review. But what we have here is that there's a continuing investigation. A plaintiff even admits that the, the defendants came to see him. Uh, they tried to get the information of who attacked him. They even suggested maybe this was a staff member who, who assaulted you. We need to know that. Um, and so it, it, it does go on for some time, but I'd also like to add that. That's the hard part for this, of this case for me, uh, seven months. Uh, he's, he's always wanting to get out of protective custody. He's screaming, yelling, you know, let me out of here. It's, it's not, not a, not a happy time for him in, in there. And he's not, he's not in for disciplinary reasons, according to your, your side of it. So, um, why, uh, and, and, and there's no really direct evidence any way of, of hearings during that period of time. Well, I, your honor, I would say two things. First of all, he, he, he essentially had the key to getting out of protective custody. If he would simply inform the officials, uh, who attacked him, this it's certainly reasonably related to penological interests for correction officials to want to find that out. You're, you're then arguing for the other side here. I think when you say that, because, uh, in other words, be a snitch and we'll let you out. That's their position. You're saying, yeah, he had the key and he could have been a snitch and they would have let him out. If they were to let him out, where was the need for protective custody? I mean, you know, that's, that's the problem that it seems to me that got here. Well, of course, your honor, if he had identified who the culprit was, that culprit could have been dealt with, could have been disciplined, perhaps charged with additional crimes, perhaps transferred, uh, to another facility. And what I wanted to say was that your point is that if, if he had reported, uh, the guy, there would have been no need to keep him in for protective custody because they would have him, they would have the assailant and they wouldn't have to worry about that. Well, that's correct, your honor. And I wanted to make the point, and I don't think I made it in the brief that when in the prison system, when you don't know who has attacked an individual, uh, and whether, for example, it's gang related, uh, it's, it's very difficult to know even where to, to transfer an inmate, uh, because gangs can, can have, uh, uh, an ability to do things over the system. Um, uh, the record doesn't reflect the, the, the, uh, what they went through to decide where to transfer him. But, but I want the court to, you know, to take cognizance of the fact that when you don't know what is placing this person at risk, it's, it's very difficult to know where to transfer him. Didn't they want him to snitch on other people beside the person who allegedly harmed him? No, your honor. Uh, I don't think... Didn't he say he wanted him to be his personal snitch? What that, that statement, uh, is, is first of all, an unsworn, unsigned, uh, undated statement and can't qualify as evidence on a summary judgment record under 28 U.S.C. 1746. Um, and in any event, plaintiff is acknowledging that they're asking him about this incident and his wife's call. Um, but I, I think the only... I asked about snitching in general, being a, a snitch for the warden. Yes. If you read the statement, I think the only reasonable reading of that statement is that they were trying to find out whether this particular incident was gang related, um, uh, or related to drugs in the prison. But my essential point is even if you accept the fact, even accept that allegation, the question is then, would he have been placed in protective custody anyway, even absent any retaliation for him not, uh, being a general prison snitch? And on these facts, given his wife's call, his injuries, he didn't immediately report them. First of all... The independent hearing, he would have anyway. His wife's call wasn't evidence just like the statement wasn't evidence, isn't that correct? The wife's call would not have been evidence just like his statement that he wanted me to be a snitch for all times. Uh, you said that's not evidence, the wife's call is not evidence as well, correct? No, I don't, I don't think that's correct, Your Honor. I think we have, uh, sufficient evidence here of the wife's call in, in, in business records, um, and, uh, testimony at the, uh, at the involuntary protective custody, custody here. He didn't testify. She did not, Your Honor. Oh, I don't know. I don't know what you're talking about. It seems that it's a call that you just a admissible on summary judgment. I think that's what you said. Um, and then I bring up to you the statement that he says they wanted me to be his, he wanted me to be his personal snitch, and you said, well, that's not admissible evidence. So are you picking and choosing what is, uh, appropriate evidence on the summary judgment motion? I, I don't think so, Your Honor, because we have, uh, business records, uh, from docs, which, which indicate, uh, uh, in, in multiple times that there was the wife's call, but, but again, regardless of whether, uh. But that's what started all this. It's not, it's not unimportant. It's, it's extremely important, Your Honor. And, and when, in light of all this evidence, if, if, plaintiff refused to identify his attacker, his attacker, he claims was a can. Well, that's correct, Your Honor. He did make that claim, but certainly the correction officials after an evidentiary hearing, hearing about the wife's call, hearing about the injuries, his failure to report them immediately. Uh, uh, there's certainly reasonable grounds here to attack. This isn't a case where a correction officials just saw some ambiguous injury on an inmate and decided to, to proceed down this. I mean, we have a call from his wife indicating fear for his safety. Let me ask one question, assuming arguendo, um, that he was attacked and, and I don't believe that, but assume he was, does the warden have the right to make him, uh, tell who his attacker was? And if so, where does that right emanate from? Well, uh, the question whether here is whether plaintiff is being retaliated against because of his exercise of a constitutional right. And there is no general first amendment right, not to be a snitch, even for non inmates. Uh. That's what, that's what, um, opposing counsel said he was going to get to. Yes. Well, I'd like to address it. Some time. There's an ancient rule in all the cases, uh, in all the cases that the public has the right to every person's evidence. Even non inmates have no constitutional right to withhold evidence of a crime in the absence of a valid claim of privilege. But, but even if non inmates had a right, uh, inmate only retains those first amendment rights that are not inconsistent with his status as an inmate or legitimate penological objectives. And, and whereas here there are clearly reasonable grounds to believe that an inmate has been assaulted. Right. But we haven't really analyzed which would make him safer, um, reporting who assaulted him. If there was such a person or not reporting it, that analysis was not done. Um, he might be safer if he said nothing, even though the warden wants to know who did it and doesn't have a right to tell the warden it's none of your business. I don't think any reasonable jury could conclude that he would be safer if, if, if he did not report who his assailant was and he was simply, and he was simply sent back to general population with his unknown assailant. You just told me that you have to worry about prisons throughout the state. There's a network of retaliation. Um, how could you not agree that he might be safer not to say anything? Uh, because if he's simply sent back to general population with his unknown assailant in this particular prison, there is certainly a substantial risk of harm. I mean, that might have violated, uh, the eighth amendment, your honor. Apart from this question, um, the, the question of the existence of the right, that would be, uh, a new determination. The Supreme Court's never held that and we've never held that, correct? That's correct, your honor. And that's why. So, so, uh, doesn't that bear on the question of qualified immunity? Uh, it, it, it not only bears on it, it, it, it's conclusive. Why didn't you raise qualified immunity below? Uh, I, I know it's never a sufficient answer to say I didn't handle the case below. Uh, and, and. That's a start. Well, thank you, your honor. Um, it, it, it is in fact a question of law and I, and I think, you know, the, the, the court can certainly reach it on appeal. Um, they didn't violate clearly established constitutional rights. Uh, plaintiff says, well, generally this court wants the district court to decide that in the first instance. Um, I think there's a legitimate exception here because this court has explicitly noted in, in published decisions and, and, and on some summary orders that it has never decided, uh, that there is this right. Um, so the right has not been clearly established, uh, as a matter of law and defendants are entitled to qualified immunity. Um, I think this is a good place to stop. Thank you, your honor. I appreciate that. Plaintiff, petitioner, the constitutional, uh, source, uh, Mr. Burns' right not to be a snitch. Thank you. Thank you, your honor. And I, I just want to quickly point to a few places in the record, um, that, uh, to rebut, uh, defendant's argument. Very quickly, plaintiff's testimony about the wife call is at, uh, joint appendix 54. Um, his statement that he told officer Jablonski right away what happened is on joint appendix 38 to 39. These are all in his deposition, by the way. So this is admissible evidence. It's not, he attached an affidavit to his complaint and the district court considered that as part of the allegations, but he also testified in a deposition subject to cross-examination consistent with that. The actual medical report is at supplemental appendix 61 and that does not appear to be signed by officer Jablonski. It's signed by someone else who appears to be, uh, someone from the, the nurse's office. What page was that in the supplemental appendix? Supplemental appendix 61. And so that corroborates his story that he told officer Jablonski immediately and then the next day filled out a medical report. Um, lastly, the, the statement that, um, the officer said to him, we've targeted you because you've been down a long time here and you know what goes on, that's in his deposition at joint appendix 48. So all of this stuff is, uh, is in the, um, is admissible as evidence. These business records of the phone calls that my adversary mentioned, those were not put in the record. Okay. So what we have here is clearly at the very least a disputed issue of fact. And I just want to say, yes, but there was, as your adversary points out, there was a hearing in which all of this was presented, uh, to the hearing officer. That's correct. And then, uh, and then Mr. Burns appealed the decision of the hearing officer and said in his appeal, uh, that they didn't put me here for my own safety. They put me here to retaliate because they wanted to get personal information. And that is why the district court denied summary judgment on the, the really the only defense they raised to this issue below, which was administrative exhaustion. So let me get to the constitutional issue and I'll get there by way of the qualified immunity issue. So while it's true that this court has previously said, um, we're not deciding in this case, whether there is such a right on there's under the substantive due process clause, that was this court's decision in Willie versus Kirkpatrick, uh, in Allah versus Jenkiewicz. And I think I'm getting the second name wrong in a summary order. This court said we don't need to reach the eighth amendment issue. Um, but on the first amendment, there is clearly established case law that the government may not compel speech, whether it's the disclosure of opinions or facts and they're not in prison setting. You've got a prison case on this. There, I don't have a prison case on this, but, uh, I think that where there's you, you apply it through the lens of the Turner factors, but where, but I think, you know, we laid out in our brief why there's no legitimate penological interest for the guards to elicit false information. And I think there's at least the disputed issue of fact. There is a pretty evident penological information, uh, for officers, uh, a purpose for officers to get to the bottom of a fight that's gone on, uh, and that could risk this person being injured in the future and maybe other people in the future or could lead to retaliation, uh, by this person or could, could disrupt the prison. Uh, that's, that's fairly obvious. That's a fairly strong interest in the part of the part of the prison authorities. That may be so your honor, but that is the interest when the facts are construed in the light, most favorable to the defendants. And I still have not heard either in their briefing or in the argument today, if the facts are construed in the light, most favorable to plaintiffs, why there isn't a constitutional right to refuse to become an informant, an all purpose informant for the guards going forward. And I think the Supreme court's first amendment jurisprudence on compelled speech, this court's decision in Jackler, uh, and many cases saying that the recognized constitutional right not to be labeled as an informant implies an eighth amendment, right? Not to be coerced to become an informant. All of that case law, uh, would make it clear to any reasonable officer that this is not an appropriate way to go about getting information. Um, and so I don't think there was qualified immunity here, but at the very least that question should be, uh, given to the district court to decide in the first instance on remand. Okay. Thank you. Thank you both.